UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  __03/29/2021__

| | |
|---|---|
| VICTOR JOSE GOMEZ,<br><br>                              **Plaintiff,**<br><br>              -against-<br><br>ANDREW SAUL, *Acting Commissioner of<br>Social Security*,<br><br>                              **Defendant.** | **1:19-cv-04708 (ALC)**<br><br>**OPINION AND ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Victor Jose Gomez brings this action challenging the Commissioner of Social Security's ("Commissioner" or "Defendant") final decision that Plaintiff was not entitled to disability insurance benefits under Title II of the Social Security Act. 42 U.S.C. §§ 401–433. Currently pending before the Court are the parties' cross motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). ECF Nos. 24, 26. The Court has considered the parties' submissions and for the reasons set forth below, it is hereby, **ORDERED**, that this matter be remanded to the Commissioner for further proceedings consistent with this opinion.

## BACKGROUND

### A.  Procedural History

On September 15, 2015 Plaintiff filed a Title II application for a period of disability and disability insurance benefits ("DIB"), alleging disability beginning March 13, 2015. R. at 30.[1] The Social Security Administration ("SSA") denied Plaintiff's disability claim on November 6, 2015. ECF No. 1 ("Compl."), ¶ 6. Mr. Gomez subsequently requested a hearing on November

---

[1] "R" refers to the Certified Administrative Record filed at ECF No. 16. Pagination follows original pagination in the Certified Administrative Record.

23, 2015. R. at 30. On November 13, 2017, a hearing was held before Administrative Law Judge ("ALJ") Lynn Neugebauer. R. at 43. Mr. Gomez appeared with his attorney, Richard Morrison. *Id.* Christina Boardman, Vocational Expert ("VE"), testified. *Id.* Bianca Vigo, a Spanish language interpreter, was also present. [2] R. at 45. On February 20, 2018, ALJ Neugebauer denied Mr. Gomez's disability claim holding that he was not disabled under Sections 216(i) and 223(d) of the Social Security Act. R. at 37. On April 9, 2018, Mr. Gomez requested a review of the ALJ's decision. R. at 5–6. On March 18, 2019, the Appeals Council denied Mr. Gomez's request for review, making the ALJ's decision the final decision of the Commissioner of Social Security. R. at 1.

On May 22, 2019, Mr. Gomez filed this action against the Commissioner of Social Security, Andrew Saul. Compl. ¶ 1. On January 14, 2020, Mr. Gomez moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) and submitted an accompanying memorandum of law in support of his motion ("Pl. Mot."). ECF Nos. 24–25. On March 13, 2020, Defendant cross-moved for judgment on the pleadings and submitted a memorandum of law in support of Defendant's motion and in opposition to Plaintiff's motion for judgment on the pleadings ("Def. Opp."). ECF Nos. 26–27. On April 7, 2020, Mr. Gomez submitted a reply memorandum of law in further support of his motion for judgment on the pleadings and in opposition to Defendant's cross motion ("Pl. Reply"). ECF No. 28. The Court now considers the parties' motions.

**B. Non-Medical Evidence**

**1. November 13, 2017 Hearing**

Mr. Gomez was born on March 6, 1959. R. at 13. He is a Spanish speaker who understands some English but cannot read or write in English. R. at 48, 179.

---

[2] At the hearing, the ALJ had to continuously clarify translations with the interpreter and the record suggests that many of Mr. Gomez's answers were affected by the interpreter's inability to translate effectively. R. at 44–63.

### i.  **Plaintiff's Testimony**

At the November 13, 2017 hearing before the ALJ, Mr. Gomez testified that he finished high school and "reached up to college" in the Dominican Republic. R. at 46. Mr. Gomez was employed as a porter at a shelter in Manhattan until March 13, 2015. *Id.* He missed a step and fell down the stairs at the shelter on May 10, 2014.[3] R. at 260. At the time of the hearing, Mr. Gomez was unemployed and supported himself financially through welfare and food stamps. R. at 50.

Plaintiff testified that he was not able to work because of daily pain in his chest, shoulder, and right knee as well as neck tightness. R. at 58. He also testified that he experiences back and shoulder pain, including when he is "lifting or carrying things," such as grocery bags at the supermarket. R. at 56–57. He stated that he took medication for depression because he was bothered by not being employed. R. at 54. He also stated that he took medication for chest pain, which comes from his spinal cord, and that he went to physical therapy for his neck and right shoulder. R. at 52–54. He testified that he lays down for most of the day because of the pain. R. at 60. In terms of cleaning around the house, he stated that he does some light sweeping with a dustpan and picks up pieces of paper off the floor, but that his daughter does his laundry. *Id.* Plaintiff has a driver's license and car which he drives to the market or to visit family once or twice a day. R. at 59. He takes the train to doctors' appointments. *Id.* Although he visits his friends and brother sometimes, he testified that he lays down when he gets home because of his "strong pain." R. at 60.

---

[3] There appears to be a discrepancy as to the date of Plaintiff's fall. The record shows that Plaintiff went to Mount Sinai St. Luke's emergency department complaining of back pain due to "miss[ing] a step and f[alling] down" on May 10, 2014, R. 260; however, his disability report says that he was "hurt at work" on June 27, 2014. R. at 180.

### ii. Vocational Expert Christina Boardman

At the hearing, Vocational Expert ("VE") Christina Boardman testified that Mr. Gomez's past work was as a janitor and noted its classification pursuant to the U.S. Department of Labor, Dictionary of Occupational Titles (DOT 381.687-014). R. at 36, 62. VE Boardman further testified that the strength of that job was "heavy" and that the "SVP was 2."[4] R. at 62. The ALJ asked VE Boardman no further questions. *Id.*

### 2. Disability Report

On September 15, 2015, Mr. Gomez submitted a Disability Report to the SSA and stated that he stopped working on the alleged onset date of March 13, 2015. R. at 180. On that day, he was fired from his job as a porter. *Id.* In his report, Mr. Gomez stated that his manager verbally approved his vacation, after which Mr. Gomez purchased plane tickets. *Id.* However, when he returned to work a few days later, he was told that he could not take his vacation. *Id.* He told management that he had already bought plane tickets, and still left for vacation on March 13, 2015. *Id.* While on vacation, Mr. Gomez was told by his co-workers that he had been fired. *Id.* When he returned to work two weeks later, he was told by his employer that he was no longer employed there. *Id.* According to Mr. Gomez, he could not look for another job because his "conditions" were bothering him. *Id.*

### 3. Function Report

In his October 9, 2015 function report, Mr. Gomez reported that he was only able to walk for two to three blocks before he had to stop and rest. R. at 207. He also reported that he had neck and back pain when sleeping, bathing, and clothing himself, due to the "arm movement"

---

[4] This was all the substantive testimony that the VE provided at the November 13, 2017 hearing. R. 61–62. The ALJ asked the standard questions regarding the VE's qualifications, but no substantive questions, other than about Plaintiff's previous job classification. *Id.*

required to do these tasks. R. at 203. Mr. Gomez stated that he does not know how to cook, but is able to warm up food, such as soup, a few times a week. R. at 204. According to Mr. Gomez, his mother and daughter prepare his meals and do most of the housework. *Id.* He reported that he leaves home once every four to five days to go to a friend's house and goes to the grocery store monthly with his mother and daughter. *Id.*

### C. Medical Evidence

Following his fall at work on May 10, 2014, Mr. Gomez was transported to Mount Sinai St. Luke's emergency department by ambulance. R. at 257–58. Doctors found a contusion over Mr. Gomez's right rib cage and he was prescribed pain medication. *Id.* On May 27, 2014, Mr. Gomez returned to the hospital complaining of chest pain. *Id.*

### 1. Medical Treatment

#### i. Dr. Angel Ruiz (Urban Health Plan, Inc. ("UHP"))

By letter dated January 26, 2017, Dr. Ruiz indicated that Mr. Gomez had been a patient of Urban Health Plan since 2012 and was currently under his care. R. at 489. The letter indicated that Dr. Ruiz had diagnosed him with an inguinal hernia, spondylosis of lumbosacral region, coronary artery disease, mixed hyperlipidemia, and depressive disorder. *Id.*[5]

On March 31, 2015, Dr. Ruiz noted on a treating physician's wellness plan report that Mr. Gomez was experiencing pain and muscle spasms in his mid-back and recommended physical therapy. R. 375–76. Specifically, Dr. Ruiz opined that Mr. Gomez was "temporarily unemployable" for six months. R. at 376.

On July 31, 2015, Mr. Gomez saw Dr. Ruiz at UHP for a reevaluation of his cholesterol levels. R. at 404. Mr. Gomez complained of back pain (rating it a seven out of ten on the pain

---

[5] The exact onset date of these conditions is not indicated in the record.

scale), and Dr. Ruiz diagnosed Mr. Gomez with pain in his thoracic spine, mixed hyperlipidemia, and abnormal cardiovascular function study. *Id.* Dr. Ruiz noted a "spasm of [the] lumbar paraspinals" and "pain with extension [and] flexion." *Id.*

### ii. Physician Assistant ("PA") Patricio Fuentes

On April 17, 2015, Mr. Gomez again went to UHP where he was seen by PA Fuentes for chest pain and lower back pain. R. at 356. Mr. Gomez rated his pain as four out of ten on the pain scale. *Id.* He also noted that while walking to his appointment he felt "lightheaded." *Id.* Although Mr. Gomez was "well appearing" and "not in acute distress," he had a "spasm of the lumbar paraspinals," and "pain with extension [and] flexion." *Id.* PA Fuentes also diagnosed Mr. Gomez with back pain, hyperlipidemia, chest pain, and dysuria and prescribed Mr. Gomez pain medication. R. at 357. After doing an EKG, PA Fuentes referred Mr. Gomez to a cardiologist because the EKG results showed a change from his previous EKG and because of his chest pain and dizziness. *Id.*

On May 29, 2015, Mr. Gomez saw PA Fuentes again for a "pulling sensation on [his] right lower quad/pelvic area," which he rated as two out of ten on the pain scale. R. at 352. PA Fuentes diagnosed him with back pain, hyperlipidemia, pelvic pain, balanitis, and nasal septal deviation. R. 354.

Mr. Gomez returned to PA Fuentes on October 2, 2015, for a follow-up on his hyperlipidemia. R. at 389. PA Fuentes assessed that Mr. Gomez was suffering from mixed hyperlipidemia, pain in thoracic spine, balanitis, and abnormal cardiovascular study. R. at 390–91. Mr. Gomez reported that he had experienced mild relief of pain upon completion of his physical therapy and rated his pain as three out of ten. R. at 389.

### iii. Dr. Pedro Suarez

On June 4, 2015, Mr. Gomez was seen by Dr. Pedro Suarez at the Plaza Del Castillo Health Center ("PDCHC") for mid back pain. R. 350. Dr. Suarez examined Plaintiff and found that he had a normal range of motion of the spine and extremities with no spinal tenderness, and a normal gait and strength for his neurologic exam. *Id.* Dr. Suarez diagnosed Mr. Gomez with muscle spasms in the thoracic spine and referred him to physical therapy. R. 350–51.

Mr. Gomez returned to Dr. Suarez on September 3, 2015 and was treated for mid back and left wrist pain. R. at 397–98. Dr. Suarez diagnosed Mr. Gomez with muscle spasms, pain in thoracic spine and a ganglion cyst—for which the doctor referred him to a hand surgeon. *Id.* On the same day, Rubidium-82 rest and Persantine stress studies were performed on Mr. Gomez, which "revealed a moderate, reversible inferior defect compromising 8% of the left ventricular myocardium" and that "[l]eft ventricular ejection fraction increased from 72% at rest to 78% during stress." R. at 366. Overall, the results from the stress studies indicated "inferior ischemia." *Id.*

On October 30, 2015, X-rays of Mr. Gomez's lumbosacral spine showed that the "height of the vertebral bodies and intervertebral disc spaces is relatively well maintained" and that there was no significant bony abnormality. R. at 439. However, X-rays of Mr. Gomez's thoracic spine showed "mild compression fractures of T5 and T6 and mild degenerative spondylosis (disc space narrowing and osteophyte formation) at T6-T7." R. at 440. The radiologist's impression was that the thoracic spine X-rays showed "[o]ld compression fractures [and] [d]egenerative changes." *Id.*

From June to September 2015, Mr. Gomez underwent physical therapy for back spasms, difficulty moving, carrying and lifting items. R. 320–328, 334–345, 348.

### iv.  Physical Therapist ("PT") Rajeshkumar Patel

On June 24, 2015, Mr. Gomez saw PT Patel for "pain in [the] thoracic [and] scapular region" that was increased with lifting, carrying and overhead activities. R. at 417. He had normal range of motion in the cervical and lumbar spine, no pain in the lower back and neck region, normal range of motion of all joints in the bilateral lower extremities, and normal ambulation. *Id.* Plaintiff had pain in the scapular region with "overhead elevation of the arms above 130 degrees." *Id.* An examination of his upper extremities showed that he was "unable to carry items in [his] hands, lift and move boxes due to pain." *Id.* PT Patel rated Mr. Gomez's strength in his bilateral upper extremities as a four out of five. *Id.* However, Mr. Gomez's strength in his core/trunk was at a "3+/5." *Id.* PT Patel's examination of his thoracic spine showed mild kyphosis and weakness at "midscapualr [sic] muscle with forward head posture and rounded shoulders." *Id.* PT Patel also noted a muscle spasm "paravertebrally at thoracic spine." *Id.*

On July 7, 2015, Mr. Gomez saw PT Patel again for pain in the thoracic or scapular region, which Mr. Gomez rated as four out of ten on the pain scale. R. at 344. His examination results were similar to the initial visit with PT Patel. *Id.* PT Patel found that Mr. Gomez had mild kyphosis and muscle spasm in the thoracic region; pain with "overhead elevation of the arms above 130 degrees;" and that Plaintiff was "unable to carry items in [his] hands, lift and move boxes due to pain." *Id.*

PT Patel also examined Mr. Gomez on July 21 and July 23, 2015 with results similar to his previous visits. R. at 338, 336.

### v.  PT Aristotle Iringan

On July 16, 2015, PT Aristotle Iringan examined Mr. Gomez at PDCHC and found that he had mild kyphosis and pain at the mid scapular region and thoracic spine, but normal ambulation and range of motion of all joints and normal overhead flexion. R. at 340.

### vi.  Dr. Kenneth Herwig

On June 29, 2015, Dr. Herwig saw Mr. Gomez in relation to his abnormal electrocardiogram results and his positive risk factors for coronary heart disease. R. at 346. Dr. Herwig diagnosed Mr. Gomez with chest pain, hyperlipidemia, and an abnormal cardiovascular study. *Id.*

Dr. Herwig also referred Mr. Gomez for an echocardiogram, which was performed on July 7, 2015. R. at 494. Mr. Gomez received abnormal results on his echocardiogram showing "decreased left ventricular compliance," "mild mitral regurgitation, trace aortic valve regurgitation, trace tricuspid regurgitation and trace pulmonic regurgitation." *Id.*

On August 21, 2015, Plaintiff saw Dr. Herwig for a re-evaluation of his chest pain and for diagnostic test results. R. at 329. Similar to the June 29, 2015 visit, Dr. Herwig diagnosed Mr. Gomez with chest pain, for which he recommended that Plaintiff continue his then-current regimen. *Id.* Dr. Herwig also diagnosed Mr. Gomez with hyperlipidemia and noted that Mr. Gomez should continue his medication (atorvastatin). *Id.* He also noted an abnormal cardiovascular study for which he ordered a Cardiac PET scan. *Id*.

### vii. Dr. Michelle Torres-Acosta

On July 17, 2015, Dr. Torres-Acosta examined Mr. Gomez and noted joint and back pain, which Mr. Gomez rated a two out of ten on the pain scale. R. at 462, 467. The neurological exam

was negative, with no numbness, weakness, dizziness, or gait problems. R. at 463.[6] The

musculoskeletal exam revealed "slight tenderness" in Plaintiff's right thoracic area, but no

deficits or difficulty walking or transferring weight. R. at 466; Def. Opp. at 4. Mr. Gomez's neck

examination results were normal. R. at 465. Dr. Torres-Acosta assessed no work limitations in

Mr. Gomez's ability to lift, push, pull, reach, and manipulate (grasping, releasing, handling)

objects, and no environmental restrictions or limitations in Mr. Gomez's ability to communicate,

cognitively understand or maintain his energy level and attendance. R. at 467–68. Dr. Torres-

Acosta also noted no limitations in Mr. Gomez's ability to achieve adequate work pace and

productivity. *Id.* However, Dr. Torres-Acosta noted that Mr. Gomez was limited in his ability to

walk, stand, kneel, squat, as well as in his ability to engage in any postural movements (repetitive

bending, crouching, stooping). R. at 467–68. Dr. Torres-Acosta also noted additional work

limitations accounting for emotional (tolerating stress, adapting to change, regulating

emotions/mood) and interpersonal factors (relating appropriately to co-workers, accepting

supervision). R. at 468.

      With respect to Plaintiff's work limitations, Dr. Torres-Acosta recommended that Mr.

Gomez alternate standing/walking and sitting every two hours and that he limit his kneeling,

squatting, and postural activities to four to five times per hour for a maximum of five hours a

day. R. at 467–68. She also recommended work accommodations in a low-stress environment in

an uncrowded or open space which limited/eliminated "lifting, pushing, pulling, carrying,

stooping, bending, [and] reaching." R. at 469. Dr. Torres-Acosta noted that Mr. Gomez was

"temporarily unable to work" for ninety days. R. at 472.

---

[6] Mr. Gomez's neurological exam was also not "normal." R. at 467.

###### viii.    Dr. Hernando Orjuela

On March 7, 2017, Mr. Gomez saw Dr. Orjuela at UHP for a cardiology follow-up. R. at 491. Mr. Gomez complained of chronic back and neck pain and Dr. Orjuela noted that Plaintiff was "disabled from chronic back pain [and] neck pain" with no reports of cardiac symptoms. *Id.* He assessed that Mr. Gomez was suffering from unspecified chest pain, inguinal hernia, non-obstructive coronary artery disease, and mixed hyperlipidemia. R. at 492.

That same day, Dr. Orjuela prescribed Mr. Gomez medications for chest pain, hyperlipidemia and for coronary artery disease. R. at 492. He also noted that Plaintiff was anticipating elective surgery for his inguinal hernia and was awaiting a response from the hospital for a surgery consultation.  *Id.* Dr. Orjuela advised Mr. Gomez to return in six months. *Id.*

#### 2.  Psychiatric Treatment

In July 2015, Plaintiff presented to FEDCAP for consideration for vocational training and employment resources.[7] Def. Opp. at 4.

###### i.    Licensed Clinical Social Worker ("LCSW") Clelia O'Connell

On July 18, 2016, Mr. Gomez saw LCSW O'Connell at St. Barnabas Hospital, where he was referred to "from Fed Cap due to his symptoms." R. at 495–99.  Mr. Gomez reported having medical issues since being injured while working as a porter in April 2013: back pain and hip pain, difficulty sleeping and negative thoughts, feeling down, sad, and unmotivated. He also reported that his symptoms had gotten worse since he was fired from his job as a porter on March 13, 2015. R. at 495.

---

[7] FEDCAP Rehabilitation Services provides a number of services including helping youth and adults graduate from high school, obtain vocational certification or a college degree, become "work ready" and obtain meaningful employment. *About Us*, FEDCAP Rehabilitation, https://www.fedcap.org/about-us/#what-we-do.

LCSW O'Connell performed a psychosocial assessment of Mr. Gomez and noted that he had a normal appearance, cooperative attitude, average eye contact, normal muscle coordination, full affect, clear speech, logical thought processes, normal thought content and perception, intact recent and remote memory, intact attention and concentration, good impulse control and judgment, and normal insight, but a depressed mood. R. at 498–99. LCSW O'Connell noted that Plaintiff had no problems in the areas of education, socialization, economics, or housing, only "an occupational problem" in that he was unemployed. R. at 499. Mr. Gomez reported that he got along well with his family members and everyone else, but that "his current barrier and obstacle is his back problem due to it not letting him work." *Id.* LCSW O'Connell noted a global assessment of functioning ("GAF") score of 50 and recommended individual and group therapy to address Mr. Gomez's depressive symptoms.[8] *Id.*

### ii.  Dr. Colette Bruni

FEDCAP referred Plaintiff to the Adult Outpatient Clinic for an evaluation of his sleep difficulties and depressive symptoms. R. at 502. Plaintiff went to the Adult Outpatient Clinic on August 3, 2016. R. at 504. Plaintiff attributed his symptoms to losing his job and his accident at work. R. at 502. Mr. Gomez noted that the reason for his visit was that he was "referred by FEDCAP." R. at 501. Plaintiff also said that "he did not know why he was referred to the outpatient clinic by FEDCAP, and that he was in the process of applying for disability and [FEDCAP] sent him" to the clinic. *Id.* However, Plaintiff also noted that he had problems sleeping, was sad that he was not working for over a year, and that his back pain decreases his

---

[8] A GAF score reflects one's level of functioning according to the clinician's judgment. Def. Opp. at 6 n. 2 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("*DSM-IV-TR*") (4th ed. text rev. 2000). "A GAF in the range of 41-50 corresponds to serious symptoms or any serious impairment in social, occupational, or school functioning; a GAF in the range of 51-60 corresponds to moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a GAF in the range of 61-70 corresponds to some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning 'pretty well,' with some meaningful interpersonal relationships." *Id.*

daily functioning. *Id.* Dr. Bruni diagnosed adjustment disorder and prescribed him with an antidepressant. R. at 502–503.

On November 29, 2016, Mr. Gomez returned to Dr. Bruni to obtain a refill on his medication. R. 513. However, Dr. Bruni noted that Mr. Gomez had failed to attend all his therapy appointments. The "clinician [was] in the process of closing [the] case if [the] patient d[id] not show up for treatment," and "treatment goals [for his depressive symptoms would] remain the same due to non-compliance." *Id.* Dr. Bruni performed another psychosocial assessment and found that Mr. Gomez's GAF score was 59. *Id.*

On January 6, 2017, Dr. Bruni examined Plaintiff. R. at 517. Mr. Gomez reported that he had no side effects from his medication, no increase in his depression or anxiety, and no change in his sleep, appetite, or level of functioning. *Id.* He also reported no psychotic symptoms or suicidal ideation. *Id.* Dr. Bruni found that Mr. Gomez had a normal appearance, cooperative attitude towards the examiner, average eye contact, normal muscle coordination, euthymic mood, full affect, clear speech, logical thought processes, normal thought content and perception, intact recent and remote memory, intact attention and concentration, good impulse control and judgment, and normal insight. *Id.*

### iii. Dr. Miriam Zibkoff

On September 15, 2016, Mr. Gomez visited Dr. Zibkoff. R. at 507. Mr. Gomez reported that he had improved sleep, but a persistent depressed mood. *Id.* He also reported that he had no side effects from his medication. R. at 508. Dr. Zibkoff found that he had a cooperative attitude, full affect, clear speech, logical thought processes, normal thought content and perception, intact memory, good impulse control, normal insight, and fair judgment. R. at 507–508. However, Dr. Zibkoff also found that Plaintiff had a depressed, anxious and mild mood and mild impaired

concentration. *Id.* Dr. Zibkoff diagnosed Mr. Gomez with "adjustment disorder [and] major depressive disorder, recurrent episode[s], moderate degree." R. at 509.

Mr. Gomez saw Dr. Zibkoff again on November 10, 2016 and reported having fair sleep and appetite and frequently depressed mood, which he attributed to his physical pain and not being able to work. R. at 510. Mr. Gomez also reported no new side effects from his medication. R. at 511. Dr. Zibkoff's examination results were unchanged from his previous visit. R. at 510–12. However, Dr. Zibkoff noted abnormal limps, constricted affect, and normal thought content that nevertheless exhibited some "paranoi[a]" and "vague ideation." *Id.*

On February 2, 2017, Mr. Gomez saw Dr. Zibkoff and reported worsened sleep, feeling more discouraged, depressed, and anxious "over pain and difficulty getting SSI." R. at 519. Dr. Zibkoff examined him and found that he had a normal appearance, average eye contact, cooperative attitude, abnormal limping, mild-moderate depressed and anxious mood, constricted, labile and tearful affect, clear but underproductive speech, logical thought processes, normal thought content and perception, intact recent and remote memory, mildly impaired attention and concentration, good impulse control, normal insight, and fair judgment. R. at 519–20. Dr. Zibkoff diagnosed him with "major depressive disorder, recurrent episode[s], moderate degree." R. at 521. Dr. Zibkoff increased Mr. Gomez's anti-depressant prescription and added a "small dose of buspirone for depression." *Id.*

### iv.  LCSW Carmilla Hill

On March 1, 2017, Mr. Gomez was seen by LCSW Hill. Mr. Gomez denied having a sad mood and stated that "he [was] only interested in his SSI or disability and writer [was] making [it] difficult for him. R. at 522.[9] LCSW noted that Mr. Gomez was only taking an anti-

---

[9] LCSW Hill noted that Plaintiff "appear[ed] confused about [the] writer's role and mental health services." R. at 522.

depressant. R. at 524. LCSW Hill examined Mr. Gomez and found that he had a normal appearance, average eye contact, normal muscle tone/coordination, cooperative attitude towards the examiner, mildly depressed mood, constricted affect, clear speech, logical thought processes, normal thought content and perception, intact recent and remote memory, mildly impaired attention and concentration, good impulse control, normal insight, and fair judgment. R.at 526. Mr. Gomez also had a GAF of 59. R. at 522.

### 3. Opinion Evidence

#### i. Dr. Cheryl Archbald

On October 19, 2015, Dr. Archbald conducted a consultative internal medicine examination. R. at 434. Dr. Archbald examined him and found that he "was in no acute distress" and had a normal gait and stance, could perform a full squat, used no assistive devices for movement, could walk on heels and toes without difficulty, required no assistance getting up and off the exam table, and could rise from a chair without difficulty. R. at 435. However, he had some reduced range of motion in the cervical and lumbosacral spine, bilateral shoulders, hips, and knees, but with full range of motion otherwise, and stable and nontender joints. R. at 436; Def. Opp. at 9. Also, Mr. Gomez's Straight Leg Raise ("SLR") test was negative on both legs in both the sitting and supine positions. R. at 436. Dr. Archbald also found that Plaintiff had full grip strength and intact dexterity in his hands and fingers, no muscle atrophy, cyanosis, clubbing, edema or trophic changes in his extremities, and full strength in his neurologic exam. R. at 437. Dr. Archbald noted that Plaintiff had "mild limitation[s] with kneeling . . . climbing stairs, and . . . lifting." *Id.*

**4. Medical Evidence Submitted to Appeals Council Subsequent to Decision by ALJ[10]**

   **i. Emergency Department Visit**

Plaintiff submitted medical records dated April 5, 2018, documenting his visit to New York-Presbyterian's emergency department for "syncope" (fainting/passing out), where he was examined by Dr. Jeffrey Ray Graham. R. at 16–17. A posteroanterior and lateral X-ray was done on Plaintiff's chest, which revealed clear lungs, normal trachea and central bronchi, and normal heart results, but "mild anterior loss of height of an upper thoracic vertebral body" for which the radiologist recommended "clinical correlation." R. at 23. A CT scan of Plaintiff's head showed "no evidence of intracranial hemorrhage, mass effect or large acute infarct." R. at 24. However, upon examining Plaintiff's calvarium, paranasal sinuses and orbits, the radiologist found "mild subcutaneous infiltration overlying the right parietal region which could relate to contusion or scarring." *Id.* Dr. Graham recommended that Plaintiff follow up with his primary care physician for reevaluation within the next week. R. at 16.

   **ii. Dr. Ruiz**

Plaintiff visited Dr. Ruiz on April 26, 2018, who diagnosed him with pre-syncope after evaluating Plaintiff's lab results. R. at 13, 15. Dr. Ruiz also diagnosed Plaintiff with the following: spondylosis of lumbosacral region without myelopathy or radiculopathy, primary osteoarthritis involving multiple joints, mixed hyperlipidemia, coronary artery disease, primary osteoarthritis of Plaintiff's right and left shoulder and both hips, and cervicalgia. R. 13.

---

[10] This new evidence should be considered by the ALJ on remand. *See Pollard v. Halter*, 377 F.3d 183, 193–94 (2d Cir. 2004) (remanding case and directing Commissioner to consider new evidence "in conjunction with the existing administrative record" and noting that new evidence on remand may support "earlier contentions" regarding the claimant's condition). However, the Court notes that this is not its basis for remand.

**LEGAL STANDARD**

**A. Judicial Review of the Commissioner's Determination**

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (internal quotation marks omitted). In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted).

**B. Commissioner's Determination of Disability**

**1. Definition of Disability**

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A);

*accord* 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be of 'such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131–32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

**2.  The Commissioner's Five-Step Analysis of Disability Claims**

The Commissioner uses a five-step process to determine whether a claimant has a disability within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4). First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. *Id*. § 404.1520(a)(4)(i). If so, the Commissioner will consider the claimant not to be disabled. *Id.* Second, if the claimant is not engaged in substantial gainful activity, the Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that meets the duration requirement of a continuous period of 12 months. *Id.* § 404.1520(a)(4)(ii); *see also id.* § 404.1509 (establishing duration requirement). Third, if the claimant suffers from such an impairment, the Commissioner determines whether that impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of the Social Security Act regulations. *Id.* § 404.1520(a)(4)(iii); *see also id.* § Pt. 404, Subpt. P, App'x 1. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's impairment, he has the residual functional capacity ("RFC") to perform his past work. *Id.* § 404.1520(a)(4)(iv). Finally, if the claimant is unable to perform his past work, the Commissioner determines whether there is other work which the claimant could perform. *Id.* § 404.1520(a)(4)(v).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). At step five, however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004); *see also* 20 C.F.R. § 404.1520(a)(4)(v).

### 3. The ALJ's Decision

First, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 13, 2015. R. at 32.

Second, the ALJ concluded that Plaintiff "has the following severe impairments: spinal disorder, left knee pain, and major depressive disorder." R. at 32.

Third, the ALJ determined that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in 20 C.F.R. § Pt. 404, Subpt. P, App'x 1. R. at 33.

Fourth, the ALJ determined that, because Plaintiff had the RFC to perform medium work (as defined in 20 C.F.R. § 404.1567(c)), Plaintiff is unable to perform his past work as a porter. R. at 36. The ALJ arrived at this conclusion through a two-step process: (1) determining whether Plaintiff's medically determinable impairment could reasonably be expected to produce his pain or other symptoms; and (2) evaluating the extent to which the intensity, persistence, and limiting effects of Plaintiff's symptoms limit his functional limitations. R. at 34. The ALJ evaluated the medical evidence and found that the former step was satisfied, but the latter step was not,

because Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not consistent with the evidence in the record. R. at 35.

Finally, the ALJ concluded that given Plaintiff's "age, education, work experience, and residual functional capacity" there are existing jobs in the national economy that Plaintiff can perform. R. at 37.

After evaluating the record through this five-step process, the ALJ concluded that Plaintiff was not disabled under the Social Security Act since the alleged onset date of March 13, 2015. R. at 37.

## DISCUSSION

Plaintiff contends that the ALJ's determination that Plaintiff was not disabled was erroneous. Plaintiff makes several arguments in support of this contention, which can broadly be categorized as follows: (1) the ALJ failed to properly develop the record; (2) the ALJ failed to properly evaluate Plaintiff's RFC; (3) the ALJ's assessment of Plaintiff's mental functioning is unsupported; and (4) the ALJ made no language determination. The Court holds that the Commissioner's decision was not supported by substantial evidence and the case should be remanded for the reasons set forth below.

### I.       The ALJ Failed to Properly Develop the Record

The ALJ has an affirmative duty to develop the record in a disability benefits case, and when the ALJ fails to do so, remand is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 79–83 (2d Cir. 1999). Once it is determined that a claimant is unable to perform their past relevant work at step four, an RFC assessment is made at step five to determine if the claimant can adjust to other types of work in the national economy. 20 C.F.R. § 404.1545(a)(5)(ii). Ordinarily, this burden is satisfied by resorting to the applicable "Grids" found in 20 C.F.R. § Pt. 404, Subpt. P, App'x 2.

*Neave v. Astrue*, 507 F. Supp. 2d 948, 953 (E.D. Wis. 2007). At step five, the determination must be made that there are a significant number of jobs in the national economy that the claimant can perform. *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014); *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). "An ALJ may make this determination either by applying the Medical Vocational Guidelines ["the Grids"] or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d at 151; *see also* 20 C.F.R. § Pt. 404, Subpt. P, App'x 2.

Here, the ALJ failed to develop the record because she relied solely on the Grids rather than consulting the VE on Plaintiff's limitations and what work he can perform in the national economy. Moreover, substantial evidence does not support the ALJ's determination that Plaintiff can perform medium work.

## A. The ALJ Erred by Relying Solely on the Grids

If a claimant suffers only from exertional impairments (physical strength activities including standing, walking, sitting, carrying, lifting, pushing and pulling), then an ALJ may rely on the Grids. *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); Medical-Vocational Guidelines (Grid Rules), 3 Soc. Sec. Disab. Claims Prac. & Proc. § 27:50 (2d ed.). However, "[w]here both exertional and nonexertional limitations are present, the guidelines cannot provide the exclusive framework for making a disability determination." *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986). The ALJ must "consult a VE if non-exertional limitations (e.g., pain, or mental, sensory, postural or skin impairments) substantially reduce the claimant's range of work." *Neave*, 507 F. Supp. 2d at 953. Under these circumstances, the VE is required to testify as to the effect of these impairments on a claimant's RFC. *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). "Pain is a nonexertional impairment." *Id.* at 1059; *see also Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir.

2013) (classifying pain, reaching, and clinical depression as nonexertional limitations). When rejecting a claimant's subjective allegations of pain, an ALJ must expressly determine credibility by detailing reasons for discrediting the Plaintiff's testimony and must discuss factors such as the claimant's prior work history, daily activities, medication dosage, among others. *Beckley*, 152 F.3d at 1060.

Here, both exertional and nonexertional limitations were present, and thus the ALJ's reliance on the Grids was error.[11] Dr. Torres-Acosta recommended work in a low-stress environment, which limited both exertional (lifting, pushing, pulling, carrying) and nonexertional (stooping, bending and reaching) factors. R. at 469. Further, Plaintiff testified that he lays down for most of the day when he is at home because of his pain and when he gets home from visiting his brother or friends. R. 60. Plaintiff was also diagnosed with major depressive disorder on multiple occasions. *See, e.g.*, R. at 509, 521. Although Plaintiff's pain and depression "may [not] be severe enough to be disabling, [Plaintiff] is entitled to have a [VE] testify as to the effect of these [nonexertional] impairments on" his RFC. *Beckley*, 152 F.3d at 1060 (finding that the ALJ erred in relying solely on the Grids to determine whether plaintiff was disabled); *cf. Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (finding that the ALJ did not err in solely applying the Grids, because the ALJ had permissibly discredited claimant's complaints of fatigue and swelling based on the lack of evidence supporting those allegations).

Although the ALJ used the VE's testimony to determine that Plaintiff was unable to perform his past "heavy" work as a porter, the ALJ did not elicit any further testimony from the VE including by posing hypotheticals which "set out [Plaintiff's] particular physical and mental

---

[11] The ALJ used Medical Vocational Rule 203.14 of the Grids, which considers a person who is of advanced age, at least a high school graduate, and whose previous work experience was unskilled not to be disabled. 20 C.F.R. § Pt. 404, Subpt. P, App'x 2.

impairments." *Darland v. Barnhart*, 233 F. Supp. 2d 1199, 1204 (D.S.D. 2002) (describing when a VE's testimony constitutes substantial evidence). Additionally, the VE did not suggest any jobs in the national economy that Plaintiff could perform. Defendant's citation to *McIntyre v. Colvin* is inapposite, as the court's holding in that case was based on a hypothetical posed to the VE which the court concluded was harmless error. 758 F.3d 146, 152 (2d Cir. 2014); Def. Opp. at 22. In this case, the VE was asked no hypothetical questions. The ALJ failed to develop the record by not posing any hypotheticals or eliciting useful testimony, specifically in regard to other jobs Plaintiff can perform. *See Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir. 1981) ("[A] vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job.").

## B. Substantial Evidence Does Not Support the ALJ's Determination that Plaintiff Can Perform Medium Work

Substantial evidence does not support the ALJ's conclusion that Plaintiff is able to perform medium work. "Medium work involves lifting no more than 50 pounds at a time with *frequent* lifting or carrying of objects weighing *up to 25 pounds*." 20 C.F.R. § 404.1567(c) (emphasis added).[12] The ALJ found that Plaintiff has the RFC "to perform medium work as defined in 20 C.F.R. § 404.1567(c), limited to the performance of simple, routine tasks," R. at 34, and discredited Plaintiff's testimony regarding his pain as inconsistent with the record, R. at 35. However, Plaintiff's testimony was not inconsistent with the record. Plaintiff testified that he felt pain when lifting things such as grocery bags, and PT Patel determined that Plaintiff was "unable to carry items in [his] hands, lift and move boxes due to pain." R. at 56, 57, 418. Although PT Patel assessed 4/5 strength in Plaintiff's upper extremities (one of the "normal"

---

[12] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *Id.* § 404.1567(a).

factors which the ALJ relied on), PT Patel also found weakness in Plaintiff's spine and

determined that Plaintiff was unable to carry items and lift boxes due to pain, which increased

when lifting objects. R. at 417–18. Dr. Torres-Acosta further recommended that Plaintiff limit

"lifting, pushing, pulling, carrying, stooping, bending, [and] reaching." R. at 469. The ALJ's

"unexplained findings . . . of a medium-level work capability appears to have been necessary for

a denial of benefits to plaintiff." *Calzada v. Astrue,* 753 F. Supp. 2d 250, 281 (S.D.N.Y. 2010)

(holding that the ALJ failed to develop the record and provide an adequate explanation for his

conclusion that claimant could perform medium work, where consulting physician's views were

inconsistent with the ALJ's reasoning).

## II.    The ALJ Did Not Properly Evaluate Plaintiff's Residual Functioning Capacity

At step five, the ALJ determined whether Plaintiff can perform work other than his past

work as a porter. However, the ALJ incorrectly determined that Plaintiff has the RFC to perform

medium work. *See* 20 C.F.R. §§ 404.1567(c), 404.1529. The Court concludes that the ALJ erred

when she (1) gave more weight to certain doctors in her RFC determination; and (2) failed to

evaluate Plaintiff's limitations on a function-by-function basis.

### A.  The ALJ Erred When She Gave More Weight to Certain Doctors to Determine Plaintiff's RFC

Under the "treating physician rule," more weight should be given to a treating physician's

opinion, than that of a consulting physician. *Fuller v. Shalala*, 898 F. Supp. 212, 217 (S.D.N.Y.

1995). As long as the treating physician's opinion is supported by substantial evidence in the

record (medical or otherwise), the treating physician rule governs. *Id.* Factors such as the nature

and length of the doctor/patient relationship should be considered by the ALJ in determining

whether a doctor is a treating physician. *Id.*; *Perry C. v. Comm'r of Soc. Sec.*, No. 19-cv-0772,

2021 WL 456912, at *3 (W.D.N.Y. Feb. 9, 2021); *see also* 20 C.F.R. § 404.1527.[13] After

considering those factors, the ALJ must comprehensively and precisely indicate her reason for

the weight she assigns to a treating physician's opinion. *Perry*, 2021 WL 456912, at *3. Failure

to provide "good reasons" for not crediting the treating physician's opinion "denotes lack of

substantial evidence" and is a "ground for remand." *Id.* (citing *Burgess v. Astrue*, 537 F.3d 117,

129–30 (2d Cir. 2008)) (internal quotation marks omitted). "An ALJ may reject a treating

physician's opinion as long as the rejection is due to contradictory medical evidence, rather than

the ALJ's own credibility judgments, speculation, or lay opinion." *Wark v. Colvin*, 164 F. Supp.

3d 635, 646 (M.D. Pa. 2015) (internal citations and quotation marks omitted). An ALJ may also

"afford a treating physician's opinion more or less weight depending upon the extent to which

supporting explanations are provided." *Debartolo v. Colvin*, 21 F. Supp. 3d 404, 414 (M.D. Pa.

2014).

      In reaching her determination that Plaintiff was able to perform medium work, the ALJ

accorded "significant weight" to Dr. Archbald's (Plaintiff's consultative physician) testimony,

and significantly less weight to Dr. Ruiz's (Plaintiff's treating physician) testimony, as well as

Dr. Torres-Acosta's testimony. R. at 35. Plaintiff was seen *once* by Dr. Archbald on October 19,

2015. R. at 435. Meanwhile, Dr. Ruiz has been Plaintiff's treating physician since 2012, and

examined Plaintiff twice in 2014, once in 2015, and again in 2018. R. at 375–76, 404, 489.

Although opinions of nonexamining sources or consultative physicians may override those of

treating sources if there is substantial evidence in the record, the ALJ erred in giving more

weight to Dr. Archbald's testimony given the lack of substantial evidence in the record to

---

[13] This section of the C.F.R. applies to claims filed before March 27, 2017 and has been succeeded by 20 C.F.R. § 404.1520c which applies to opinions and findings for claims filed on or after March 27, 2017. Plaintiff filed his claim on September 15, 2015, so the former provision applies to this analysis.

support that decision. *See Fuller v. Shalala*, 898 F. Supp. at 217. More specifically, the ALJ cited

the positive results of Dr. Archbald's examination, (such as normal gait and stance, being able to

perform a full squat, rising from a chair without difficulty, and full grip strength), and concluded

that Plaintiff was "able to perform the exertional demands of medium work." R. at 35, 435.

However, the ALJ failed to point out that Dr. Archbald's examination also revealed reduced

motion in Plaintiff's spine, shoulders, hips, and knees. R. at 435. These results are consistent

with what Dr. Ruiz found on several occasions between 2012 and 2015, including pain in

Plaintiff's spine in addition to muscle spasms. R. at 404, 489. The ALJ similarly gave little

weight to Dr. Torres-Acosta's testimony. R. at 36. Dr. Torres-Acosta had noted Mr. Gomez's

limitations in walking, standing, sitting, kneeling, and squatting. R. at 467–68. Moreover, the

examinations of PT Fuentes, PT Patel, and Dr. Suarez are consistent in their spasm diagnoses.[14]

R. at 344, 350–51, 356, 375–76, 397–98, 404, 417.

Along with a string cite of exhibits from physical exam results, the ALJ's reason for

assigning little weight to both Dr. Ruiz's and Dr. Torres-Acosta's testimony was that it was

inconsistent with the "findings upon physical examinations . . . which document essentially

normal findings." R. at 36. "[A]n ALJ may not reject a treating physician's opinion based solely

on . . . conclusory assertions of inconsistency with the medical record." *Perry C. v. Comm'r of

Soc. Sec.,* No. 19-CV-0772MWP, 2021 WL 456912, at *5 (W.D.N.Y. Feb. 9, 2021) (internal

citations and quotation marks omitted). In *Perry*, the ALJ discounted the claimant's treating

physician's opinion because "[the opinion] was inconsistent with the medical evidence that

show[ed] normal physical findings after the alleged onset date" and because "it was inconsistent

---

[14] Although muscle spasms may not cause an inability to work, their consistency may indicate that a claimant is better suited to perform a job in the national economy with a lower level of exertion, such as light work or sedentary work, as opposed to medium work. *See* 20 C.F.R. § 404.1567.

with the record as a whole and was internally inconsistent." *Id.* at *5. (internal citations and quotation marks omitted). The *Perry* court held that these were not "good reasons" and noted that it would "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion." *Id.* at *5 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)).

**B.  The ALJ Erred When She Failed to Evaluate Plaintiff's Limitations on a Function-by-Function Basis**

The ALJ erred in determining that Plaintiff can do medium work before fully assessing his work-related abilities on a function-by-function basis. Before an ALJ can determine a claimant's RFC based on exertional levels (sedentary, light, medium, heavy, or very heavy), "he must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on *a function-by-function basis.*" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (emphasis added) (internal quotation marks omitted); *see also* 20 C.F.R. §§ 404.1545, 416.945. These functions include physical (standing, sitting, walking, lifting, carrying, pushing, pulling), mental (understanding, remembering, carrying out instructions, and responding to supervision), and other abilities that may be affected by impairments (seeing, hearing, ability to tolerate environmental factors). Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996); *see also* 20 C.F.R. § 404.1545(b)-(d); *id.* § 416.945; *Cichocki*, 729 F.3d at 176.

The Second Circuit has refused to adopt a "*per se*" rule which warrants remand simply because an ALJ has not made an "explicit" function-by-function analysis. *Cichocki*, 729 F.3d at 176; *see also Casino-Ortiz v. Astrue*, No. 06-cv-0155, 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (ALJ does not have to produce a detailed statement of each function). *Cf. McMullen v. Astrue,* No. 5:05-cv-1484, 2008 WL 3884359, at *6 (N.D.N.Y. Aug. 18, 2008) (remanding based

on the ALJ's failure to explicitly conduct a function-by-function analysis). However, "remand

may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant

functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's

analysis frustrate meaningful review." *Cichocki*, 729 F.3d at 177. In *Cichocki* the Second Circuit

held that although the ALJ did not conduct an explicit function-by-function analysis, remand was

not warranted because the ALJ addressed all of the plaintiff's relevant limitations and the "ALJ's

conclusion [was] supported by substantial evidence." *Id*. at 178. In determining the plaintiff's

physical limitations in that case, the ALJ cited to a doctor's assessment that the plaintiff could

"lift/carry 20 pounds continuously and up to 50 pounds occasionally, sit for six hours, stand for

four hours and walk for three hours in an eight-hour workday." *Id.* (internal quotation marks

omitted).

      In contrast to *Cichocki,* remand is warranted here because the ALJ did not address all of

Plaintiff's relevant limitations nor did she cite to any medical evidence supporting her conclusion

that Plaintiff had the RFC to perform medium work. Dr. Torres-Acosta assessed that Mr. Gomez

could stand, walk and sit, but that he should alternate standing and walking with sitting every

two hours, and that he could kneel, squat, and perform postural activities four to five times per

hour for a maximum of five hours a day. R. at 468. She also recommended work

accommodations which limited or eliminated "lifting, pushing, pulling, carrying, stooping,

bending, [and] reaching. R. at 469. In contrast to *Cichocki*, here the ALJ made no reference to

this medical evidence. Other inadequacies in the record also frustrated meaningful review,

including the ALJ's sole reliance on the Grids and the significant weight that was given to

Plaintiff's consultative physician as opposed to his treating physician as discussed *supra*.

### III.       The ALJ's Assessment of Plaintiff's Mental Functioning is Supported

There is substantial evidence in the record that supports the ALJ's finding that Plaintiff has "consistently exhibited essentially normal findings" upon "mental status examinations." R. at 36. Although Plaintiff suffers from major depressive disorder, "he is able to perform the mental demands of work." *Id.* All of the medical professionals that Plaintiff saw for psychiatric treatment consistently reported findings of logical thought processes, normal thought content, perception, intact memory, cooperative attitude, clear speech and intact concentration and attention, among other "normal" to moderate findings. R. at 36, 498, 507–508, 517, 519–20, 526.

Further, the Court agrees with Defendant that the record suggests that Plaintiff's depressive symptoms were due to temporary situational stressors. R. at 19; Def. Opp. at 19. The only "occupational problem" that LCSW O'Connell identified was that he was unemployed. R. at 499. Plaintiff reported to Dr. Bruni that he was sad that he was not working for over a year. R. at 501. Plaintiff attributed having a frequently depressed mood to his physical pain and not being able to work and "difficulty getting SSI." R. at 510, 519. Further, when seen by LCSW Hill, Plaintiff denied having a sad mood, and noted that "he [was] only interested in his SSI or disability and writer [was] making [it] difficult for him." R. at 522.

Plaintiff points out Plaintiff's GAF score of 50 is an indicator that the medical evidence is contrary to the ALJ's assessment. Pl. Reply at 16; R. at 499. A GAF of 50 indicates serious symptoms or impairments in social or occupational functioning. Def. Opp. at 6. However, "[u]nless the GAF rating is well supported and consistent with other evidence in the file, it is entitled to little weight under our rules." *Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (quoting U.S. Soc. Sec. Admin., Office of Disability Programs, AM-13066, Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (Oct. 14, 2014)). Plaintiff failed to

indicate that Plaintiff's GAF score improved to 59 only a few months after receiving a score of 50. R. at 499. A GAF of 59 suggests moderate symptoms or difficulty in social or occupational functioning. Def. Opp. at 6. Unless a medical professional explains the reasons behind their GAF rating and the period to which it applies, "[the GAF rating] does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis." *Estrella*, 925 F.3d at 97. Neither LCSW Hill or Dr. Bruni (who both assigned the two different GAF scores at issue) explained the reasoning behind their assigned scores or to what period they applied. Therefore, Plaintiff's GAF scores carry little weight in assessing the ALJ's determination of Plaintiff's mental functioning.

### IV.     The ALJ Is No Longer Required to Make a Language Determination

The Court need not address Plaintiff's contention that the ALJ erred by not making a language determination as the provision of the C.F.R. that Plaintiff relies on has since been revised to remove this requirement. Pl. Reply at 14; *see also* 20 C.F.R. § 416.964(b).[15]

### CONCLUSION

For the reasons state above, this case is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

**SO ORDERED.**

**Dated:** March 29, 2021
   New York, New York                              _____
                                                              **ANDREW L. CARTER, JR.**
                                                              **United States District Judge**

---

[15] Under the previous version of this provision (effective until April 27, 2020), evaluating a claimant's educational level included consideration of how well the claimant was able to communicate in English. Under the revised version (effective as of April 27, 2020) all references to the ability to communicate in English have been deleted. 20 C.F.R § 416.964.